IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 16, 2020

**STATE OF TENNESSEE v. JOSEPH JOHN TURCHIN**

**Appeal from the Criminal Court for Monroe County**
**No. 17-380   Andrew M. Freiberg, Judge**

_____

**No. E2020-00491-CCA-R3-CD**

_____

A Monroe County Criminal Court Jury convicted the Appellant, Joseph John Turchin, of two counts of especially aggravated sexual exploitation of a minor, Tenn. Code Ann. § 39-17-1005, one count of sexual exploitation of a minor, Tenn. Code Ann. § 39-17-1003, and one count of unlawfully photographing a minor in violation of the minor's privacy, Tenn. Code Ann. § 39-13-605.[1] The trial court imposed a total effective sentence of twenty years in the Tennessee Department of Correction. On appeal, the Appellant contends that the trial court erred by denying his motion to suppress, arguing that he was not properly served with a warrant for the search of his cellular telephones. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and J. ROSS DYER, JJ., joined.

J. Patrick Henry, Kingston, Tennessee, for the Appellant, Joseph John Turchin.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Stephen D. Crump, District Attorney General; and Ashley M. Ervin, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In December 2017, a Monroe County Grand Jury returned an indictment charging the Appellant in counts one and two with especially aggravated sexual exploitation of a

---

[1]Tennessee Code Annotated section 39-13-605 was amended effective July 1, 2021.

minor, in count three with sexual exploitation of a minor, and in count four with unlawfully photographing a minor in violation of the minor's privacy. The charges stemmed, in part, from evidence law enforcement obtained from a search of the Appellant's cellular telephones.

Prior to trial, the Appellant filed a motion to suppress the evidence obtained during the search of his cellular telephones, arguing that he was not served with a copy of the search warrant as required by Rule 41 of the Tennessee Rules of Criminal Procedure. The sole witness at the suppression hearing, Monroe County Sheriff's Detective Jason Fillyaw, testified that in October 2017, he searched the Appellant's residence after receiving the Appellant's written consent. During the search, Detective Fillyaw discovered a number of cellular telephones that belonged to the Appellant.

Detective Fillyaw interviewed the Appellant on October 12, 2017. Detective Fillyaw advised the Appellant that he "would be obtaining a search warrant to complete a forensic download" of any evidence on the Appellant's cellular telephones. Thereafter, Detective Fillyaw obtained three signed copies of the warrant for the search of the cellular telephones, and he made a fourth photocopy of the search warrant for his file.

Detective Fillyaw said that on October 16, 2017, after the evidence was downloaded from the cellular telephones, he again interviewed the Appellant. The interview was not video recorded. During the interview, Detective Fillyaw told the Appellant that he had obtained a search warrant, but he did not "recall clearly" whether he served the Appellant with the warrant. Detective Fillyaw said that he had looked in his files recently and that the only copy in the file was the fourth photocopy he had made. Detective Fillyaw did not recall ever failing to serve a copy of a search warrant and explained that any doubt he had about this case was because the search occurred almost two years earlier.

On cross-examination, Detective Fillyaw said that his first interview with the Appellant was after the cellular telephones were seized during the consensual search. He interviewed the Appellant a second time after the warrant was obtained. During both interviews, Detective Fillyaw advised the Appellant that he was "obtaining or had obtained a search warrant."

Detective Fillyaw said that he told the Appellant about the evidence the police had discovered on the cellular telephones. He stated that the evidence from the cellular telephones was "[p]artially" responsible for the charges against the Appellant, but other evidence was discovered during the consensual search of the Appellant's residence.

During questioning by the trial court, Detective Fillyaw agreed that "two years removed, [he] can't under oath say [he has] a distinct memory of whether [he] did slap the

warrant in [the Appellant's] hand in this particular case." Detective Fillyaw further agreed that during his first interview of the Appellant, he told the Appellant he was going to obtain a warrant to search the cellular telephones. Detective Fillyaw also agreed that in the second interview, he advised the Appellant that he had obtained a warrant and confronted him with the results of the search.

The trial court accredited Detective Fillyaw's testimony. The court found that there was no evidence presented at the suppression hearing to support the Appellant's argument that he did not receive a copy of the search warrant. The trial court further found that the Appellant had actual knowledge, both before and after the search that the State had obtained a search warrant. Accordingly, the trial court denied the motion to suppress.

At trial, the victim's grandmother testified that she lived in Sweetwater with her husband, her granddaughter, and her grandson, the victim. The victim was born on January 17, 2003. The victim's grandmother said that the victim's mother was in "rehab" and that his father was in prison.

The victim's grandmother said that in 2014, the victim played baseball, but she had health issues that prevented her from taking the victim to and from baseball games. The victim's grandmother became friends with the Appellant when he volunteered to provide transportation for the victim. In 2016, the Appellant and his wife separated, and the Appellant started sleeping in his car. The victim's grandparents allowed the Appellant to sleep in a "church building" they owned until he could secure other housing. Subsequently, throughout 2016 and into 2017, the grandparents rented the Appellant a house they owned which was located behind their house. The Appellant spent time with the victim and his family and came to their house for dinner almost every night.

On cross-examination, the victim's grandmother said that she initially thought the Appellant's relationship with the victim was good and that the victim thought of the Appellant as his father. The victim's grandmother said that she was not jealous of the amount of time the Appellant spent with the victim.

Detective Doug Mills with the Monroe County Sheriff's Department testified that he was trained in extracting information from cellular telephones. Detective Fillyaw gave Detective Mills six cellular telephones that belonged to the Appellant, and Detective Mills extracted evidence from the cellular telephones. One of the telephones did not have a passcode, but the passcode for the remaining five telephones was the victim's birthday. Only one cellular telephone did not contain any photographs. On the remaining five cellular telephones, the police found approximately 6,000 photographs, 1,300 of which included the victim. Detective Mills said that some of the photographs showed the victim in "provocative pose[s]." Videos of the victim masturbating were also on the cellular

telephones. Around the "four-minute mark" on one of the videos, Detective Mills heard a man's voice say, "Come, baby, come." In addition, four screen shots of the victim's penis were taken.

On cross-examination, Detective Mills acknowledged that most of the photographs showed the victim as "[j]ust a kid having fun, playing." Detective Mills did not know who had taken the photographs or videos. Detective Mills said that Detective Fillyaw obtained a warrant to search the cellular telephones and that Detective Mills executed it. Detective Mills asserted, "I don't touch any phones unless I've got a search warrant or written permission to do the search by the owner of the phone."

Detective Fillyaw testified that he was trained to investigate offenses related to child sex abuse and that he began investigating the Appellant in October 2017. Around 9:30 or 10:00 p.m. on October 11, 2017, Detective Fillyaw obtained the Appellant's consent to search his residence. No one else lived at the residence. On a shelf in the bedroom closet, Detective Fillyaw found a cardboard box containing several cellular telephones. He also found a laptop computer in the bedroom.

Detective Fillyaw said that around 12:30 or 1:00 a.m. on October 12, 2017, he interviewed the Appellant in Detective Bill Illingworth's office at the Monroe County Sheriff's Office. Child Protective Services (CPS) Supervisor Millicent Thomas and CPS Investigator Courtney Stapp were also present for the interview. A video of the interview was shown to the jury. At the time of the interview, Detective Fillyaw had not obtained any evidence from the cellular telephones found at the Appellant's residence. However, Detective Fillyaw asked the Appellant about printed photographs that were found at the Appellant's residence. On October 13, 2017, Detective Fillyaw gave the cellular telephones and a warrant to search the telephones to Detective Mills. Digital copies of the printed photographs found in the residence were also on the cellular telephones.

Detective Fillyaw said that after Detective Mills downloaded the evidence from the Appellant's cellular telephones, Detective Fillyaw watched the videos retrieved from the telephones; the videos showed the victim in his bedroom at his grandmother's residence. Detective Fillyaw also looked at the other images found on the cellular telephones.

Detective Fillyaw said that on October 16, 2017, he and Ms. Thomas interviewed the Appellant. The State showed the video of the interview to the jury. Detective Fillyaw said that he had found "quite a few" printed photographs in the Appellant's closet, and, during the interview, the Appellant said that "he printed all the images on his phone." The Appellant also admitted that he recorded the videos of the victim "just before or right after [the victim] turned 14," which occurred on January 17, 2017.

- 4 -

On cross-examination, Detective Fillyaw said that when he, Detective Illingworth, Ms. Thomas, Investigator Stapp, and a CPS intern initially went to the Appellant's residence with a search warrant, no one was at the residence. While they were at the residence, a silver Ford Explorer SportTrac arrived. The Appellant was driving the vehicle, and Mona Moore was the passenger. Detective Illingworth obtained the Appellant's consent to search the residence. The Appellant claimed ownership of the cellular telephones found in the residence. Detective Fillyaw said that the police seized a laptop computer but that nothing was found on it.

Detective Fillyaw agreed that the Appellant's versions of events did not change from the first interview to the second interview. The Appellant consistently maintained that "there was . . . this issue with [the victim] and him masturbating and he was trying to prove a point." Detective Fillyaw agreed that the Appellant was not in any of the videos the police recovered. The Appellant told Detective Fillyaw that he thought of the victim as a son and that the victim looked at him as a father figure. Detective Fillyaw agreed that many of the photographs of the victim were not sexual in nature.

Mona Moore testified as the only defense witness. Ms. Moore stated that she had known the Appellant for ten years and that they had been in a "[p]retty serious" relationship for four-and-a-half years. Ms. Moore said that for the three-and-a-half years prior to the charges, the Appellant had lived "at [the victim's grandmother's] residence." Ms. Moore stated that she and the Appellant shared a vehicle, their cellular telephones, and "just about everything we had." Ms. Moore said that her name was on the account for the cellular telephones, that she purchased the cellular telephones, and that she paid the bill for the cellular telephones.

Ms. Moore said that she was present the night the police searched the Appellant's residence. She stated that she told Detective Illingworth, Detective Fillyaw, and Sheriff Tommy Jones that she owned the cellular telephones and that she did not consent for law enforcement to take or search the telephones. Ms. Moore said that only one cellular telephone was active and that it was in her Ford Explorer SportTrac, which was the vehicle she and the Appellant drove to the Appellant's residence just prior to the search. The Appellant had the other cellular telephones "just put up." Ms. Moore explained that she had purchased one of the cellular telephones and that the Appellant's ex-wife had purchased one of the cellular telephones. She did not explain who purchased the other telephones. She agreed that none of the cellular telephones seized by the police "had an active phone number or any account associated with them."

On cross-examination, Ms. Moore acknowledged that she and the Appellant had been in an "on and off" relationship for twenty years but that their relationship had been "solid" for four-and-a-half years. She conceded that she did not want anything bad to

- 5 -

happen to the Appellant because she cared about him. Ms. Moore acknowledged that only two of the cellular telephones belonged to her. She said that the Appellant had put the cellular telephones in a box and that she did not know where the Appellant had put the box. She said that the Appellant set up the passcodes on the telephones, that she did not know the passcodes, and that she could not access the telephones unless the Appellant "unlocked" them.

The jury found the Appellant guilty on counts one and two of especially aggravated sexual exploitation of a minor, on count three of sexual exploitation of a minor, and on count four of unlawfully photographing a minor in violation of the minor's privacy. The trial court imposed sentences of ten years for each conviction of especially aggravated sexual exploitation of a minor and merged the convictions in count four and count two. Additionally, the trial court imposed a sentence of three years for the conviction of sexual exploitation of a minor. The trial court ordered that the sentences for counts one and two were to be served consecutively and that the sentence for count three was to be served concurrently with count two, for a total effective sentence of twenty years.

On appeal, the Appellant contends that the trial court abused its discretion in denying the Appellant's motion to suppress evidence seized from the cellular telephones because the search warrant was not properly served on the Appellant.

## II. Analysis

Regarding the search warrant, the Appellant contends that Tennessee Rule of Criminal Procedure 41 required the police to serve him with the warrant for the search of the cellular telephones or to leave a copy of the warrant for the Appellant at the premises. He contends that the failure to leave a copy of the warrant denied him "the opportunity to review or have notice of the search"; thus, it violated his constitutional right to due process, and the evidence seized from the phones should have been suppressed. The State responds that no evidence was adduced at the suppression hearing to support the Appellant's claim that he was not served with the search warrant. We agree with the State.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the prevailing party is "entitled to the strongest legitimate view of the evidence adduced at

the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23.

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." Likewise, article 1, section 7 of the Tennessee Constitution provides that "the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures." While neither constitution specifies when a search warrant must be obtained, generally law enforcement must secure a valid warrant before conducting a search. See State v. McCormick, 494 S.W.3d 673, 678 (Tenn. 2016) (citing Kentucky v. King, 563 U.S. 452, 459 (2011), State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008)). Our supreme court has stated that "searches and seizures conducted pursuant to warrants are presumptively reasonable," and that "warrantless searches and seizures are presumptively unreasonable." Id. at 678-79.

Tennessee Rule of Criminal Procedure 41 controls the issuance, service, and execution of search warrants. Rule 41(d) provides that a magistrate shall prepare an original and two exact copies of a search warrant and that one of the copies "shall be left with the person or persons on whom the search warrant is served." Tenn. R. Crim. P. 41(d). Rule 41(e)(4) reiterates that the officer who executes the search warrant "shall: (A) give to the person from whom or from whose premises the property was taken a copy of the warrant and a receipt for the property; or (B) shall leave the copy and receipt at a place from which the property was taken." Tenn. R. Crim. P. 41(e)(4). Rule 41(g) provides that "[a] person aggrieved by an unlawful or invalid search or seizure may move the Court pursuant to Rule 12(b) to suppress any evidence obtained in the unlawful search or seizure." Tenn. R. Crim. P. 41(g). Further,

> [t]he motion to suppress . . . may be granted, under applicable substantive law . . . if the evidence in support of the motion shows that . . . the serving officer—where possible—did not leave a copy of the warrant with the person or persons on whom the search warrant was served.

Id. at (g)(6).

- 7 -

In State v. Daniel, 552 S.W.3d 832, 834 (Tenn. 2018), our supreme court examined whether an officer's "apparent failure to give the Defendant a copy of the [search] warrant [for her blood] at the time of its execution required suppression of the evidence obtained pursuant to the warrant." Our supreme court acknowledged that Rule 41(g) provided that a person aggrieved of an unlawful or invalid search may move to have the evidence seized as a result of that search suppressed and that, at that time, the motion "shall be granted"[2] if the serving officer failed to serve a copy of the warrant. Id. at 835. However, the court demonstrated a "willingness to create narrow good-faith exceptions to Rule 41's exclusionary rule where the deviations from that Rule's stringent requirements are inadvertent, inconsequential, and clearly resulted in no prejudice to the defendant." Id. at 838. In doing so, our supreme court recognized:

> "Warrants serve to provide law enforcement officials and persons subject to such warrants with written evidence that the search has been authorized by a judicial officer upon a showing of probable cause. Warrants also serve to define and to limit the duration and scope of authority of law enforcement officials by delineating the specific date and time of issuance of the warrant and by describing with particularity the premises to be searched and the items subject to seizure."

Id. at 840 (quoting State v. Davis, 185 S.W.3d 338, 345 (Tenn. 2006)). The supreme court further recognized that "'[t]he purpose of providing notice to the owner of seized property is to notify the owner of the source of the seizure so that the owner can pursue available remedies for its return.'" Id. (quoting State v. Roy Len Rogers, No. E2011-02529-CCA-R3-CD, 2013 WL 5371987, at *18 (Tenn. Crim. App. at Knoxville, Sept. 23, 2013)).

In Daniel, the supreme court stated that the property to be seized was the Defendant's blood, that the Defendant knew her blood was being drawn, "by whom, at what time, and for what purpose." Id. The supreme court stated that under the facts of that case, the officer's "failure to leave a copy of the warrant with the Defendant did not cause any particular or specific harm or prejudice to the Defendant, and the Defendant [did] not contend that she suffered any such particular or specific prejudice." Id. The supreme court explained:

> Officer Valentin testified that it was her practice to provide a copy of search warrants to the persons subjected to

---

[2]Daniel concerned a prior version of Rule 41(g)(6). In 2018, Rule 41(g)(6) was amended to remove the word "shall" and insert the word "'may'" in the section of the rule regarding the exclusion of evidence, and ma[d]e Rule 41 more consistent with recent statutory changes and recent case law." Rule 41, Advisory Comm'n Cmt.

them but that she could not specifically recall providing one to the Defendant. She also testified that she had no reason to withhold a copy of the warrant from the Defendant, had not purposefully withheld the copy, and, if she had failed to give a copy to the Defendant, it was a mistake. The trial court explicitly found Officer Valentin to be an "honest" witness, and we have discerned no indication in the record that Officer Valentin's failure to leave a copy of the warrant with the Defendant was the result of anything other than a simple, inadvertent oversight.

Based upon the record before us, particularly the trial court's finding that Officer Valentin's testimony was truthful, we conclude that Officer Valentin's oversight occurred in good faith. We also conclude that Officer Valentin's oversight caused no prejudice whatsoever to the Defendant.

Id.

In the instant case, as in Daniel, the Appellant contends that the trial court should have granted his motion to suppress because he was not served with a copy of the warrant for the search of his cellular telephones. Detective Fillyaw, the only witness who testified at the suppression hearing, acknowledged that he could not recall with certainty whether he served the Appellant with the warrant for the search of the cellular telephones. He explained that any doubt he had was the result of the two-year delay between the search and the hearing. Regardless, Detective Fillyaw testified that his practice was to always serve search warrants on the people whose property was to be searched and that he could not recall ever failing to do so. Detective Fillyaw further testified that the only search warrant in his file was the photocopy he made for his file. The trial court accredited Detective Fillyaw's testimony and found that nothing was before the court "upon which [it] could even find that [the Appellant] wasn't delivered a copy" of the search warrant. In other words, the trial court found that the Appellant failed to meet his burden of demonstrating that the service of the search warrant did not comply with the technical requirements of Rule 41. See Daniel, 552 S.W.3d at 841.

The trial court also accredited Detective Fillyaw's testimony that the Appellant had "actual knowledge, both before and after that this search did in fact occur, and he was confronted with the information found from that search." Our supreme court has explained that

> [w]hen a defendant has demonstrated that a search warrant or its supporting affidavit is noncompliant with the technical requirements of Rule 41 or other relevant statute(s), the burden shifts to the State to establish by a preponderance of the evidence that (1) the technical noncompliance was the result of a good-faith error and (2) the error did not result in any prejudice to the defendant.

Daniel, 552 S.W.3d at 841. Detective Fillyaw's testimony, which was accredited by the trial court, demonstrates that the Appellant had actual knowledge of the search of the cellular telephones. Our supreme court has recognized such actual knowledge as a permissible "good-faith exception to Rule 41's technical requirement that the officer executing a search warrant leave a copy of the warrant with the person searched." Id. Moreover, as the State noted, the Appellant has failed to show that he was prejudiced by the alleged deficiency. We conclude that the trial court did not err in denying the motion to suppress.

### III. Conclusion

Finding no error, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE

- 10 -